**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| In re: | ) ) ) | Chapter 11 |
| Phoenix Payment Systems, Inc., | ) ) | Case No. 14-11848 (MFW) |
| Debtor. | ) ) ) | |
| Phoenix Payment Systems, Inc., | ) ) ) | |
| Plaintiff. | ) ) | |
| v. | ) ) ) | |
| POST Integrations, Inc. and Ebocom, LLC, | ) ) | Adv. Pro No. _____ |
| Defendants. | ) ) ) | |

## COMPLAINT

Phoenix Payment Systems, Inc. (the "Debtor"), by and through its undersigned counsel, alleges the following based upon knowledge as to itself and upon information and belief as to other matters:

### Nature of the Case

1. The Debtor brings this complaint against POST[1] for a ruling that POST does not own any of the code that the Debtor sold to the Purchaser, or that POST's claims, whether styled as ownership or for damages, cannot stand.

2. More than eight years ago, POST sent correspondence to the Debtor indicating its rank suspicion that the Debtor *may be* using its code. Since then, POST's silence has been remarkable. POST was silent when it chose not to appeal a September 2006 federal court order

---

[1] Unless the context requires otherwise, capitalized terms used in this section of the Complaint have the meanings given to them in subsequent sections of the Complaint.

that held that POST *did not own* what it calls the "POST Custom Code."  Years later, POST also was silent after it received and reviewed a September 2008 settlement agreement whereby Lexcel (*i.e.*, the party that POST claims conveyed the POST Custom Code to POST), in exchange for $400,000, granted the Debtor a license to use the POST Custom Code and affirmatively represented that POST did not own the POST Custom Code and POST would have no reason to review the Debtor's code. It should thus come as no surprise that POST, over the last eight years, never brought a lawsuit against the Debtor relating to the POST Custom Code or otherwise.  Why? Because POST's conduct clearly shows that it (1) did not believe it owned the so-called POST Custom Code and (2) did not believe the Debtor was using any of its code.

3. Then, less than two months ago, POST suddenly appeared in the Debtor's bankruptcy case when it objected to the Sale.  In stark contrast to the letter that POST sent to the Debtor over eight years ago, POST, in its various filings with this Court, now claims that the code that the Debtor was using and sold to the Purchaser was, in fact, its code.  POST has not shared with the Debtor or this Court why its uncertainty eight years ago has been transformed into a certainty today.  Consequently, this transformation remains a mystery but POST's motivation for suddenly appearing is not:   POST has its hand out and, based on its Proof of Claim, wants $10 million or *twenty percent* (20%) of the Sale proceeds.

4. The asserted amount in its Proof of Claim is perhaps more remarkable than its silence over the last decade when the undisputed facts are understood: (1) POST agreed to pay Nelcela $750,000, plus an hourly customization fee, to create the POST Custom Code; (2) POST only paid Nelcela $562,000 (*i.e.*, it did not pay Nelcela the full purchase price) for the POST Custom Code because the POST Custom Code did not work and has never worked; (3) POST paid $500,000 for code to replace the POST Custom Code; (4) POST received a judgment in an

amount that was well in excess of the amount that it paid to Nelcela to create the POST Custom Code; and (5) the Debtor paid Lexcel $400,000 for a license to use the POST Custom Code. How it can assert a $10 million claim for code that does not work, did not cost anywhere near that amount of money, was inexpensively replaced and for which it effectively received a refund in the form of a judgment, is also a mystery. Indeed, one wonders: who would ever sit on a $10 million asset, never once use it in its business, never license it and never sue for infringement?

5. In order to be entitled to receive *any* of the Sale proceeds (let alone twenty percent (20%) of them), POST must jump over at least four impossibly high hurdles. <u>First</u>, POST must prove that it owns the POST Custom Code. <u>Second</u>, POST must prove that the Debtor had the POST Custom Code and sold it to the Purchaser. <u>Third</u>, POST must prove that the Debtor did not have a license to use the POST Custom Code. <u>Fourth</u>, POST must explain why its allegations are not barred by the statute of limitations. Unfortunately for POST, the undisputed facts clearly show that POST will not be able to jump over any of these hurdles and thus its claim that the Debtor sold its code must fail.

6. Counts I through VII of the Complaint seek the following declaratory judgments: (1) that POST never owned the Post Custom Code; (2) that Lexcel granted the Debtor a perpetual, royalty free and fully transferrable license to use the POST Custom Code; (3) that the Debtor did not sell the POST Custom Code to the Purchaser; (4) that POST has no ownership or other interest in any of the source code that was sold to the Purchaser; (5) that POST has no right or other entitlement to any of the proceeds of the Sale; (6) in the event that it is determined that POST owns what it calls the POST Custom Code, some or all of that code is not copyrightable; and (7) that POST's claim for ownership is barred by the statute of limitations. In Count VIII, the Debtor seeks all of its reasonable attorneys' fees and nontaxable costs under the Copyright

Act, 17 U.S.C. § 505.  Finally, in Count IX, the Debtor objects to POST's Proof of Claim for the reasons set forth in Counts I-VII and because POST's claim for ownership is time-barred and the asserted amount in the Proof of Claim is frivolous.

## Jurisdiction

7.  This Court has jurisdiction over this Complaint pursuant to 28 U.S.C. §§ 157 and 1334.  Venue in this district is proper under 28 U.S.C. § 1409.

8.  This is a core proceeding under 28 U.S.C. § 157(b).  Under Local Rule 7008-1, the Debtor consents to the entry of final orders or judgments by this Court if it is determined that the Court cannot enter final orders consistent with Article III of the United States Constitution.

9.  This Court has general personal jurisdiction over defendant Ebocom, LLC ("Ebocom") because it is a Delaware entity, and specific jurisdiction over both defendants because the activities giving rise to this complaint occurred in the United States and involved a Delaware company.  Each defendant also has appeared in the Debtor's bankruptcy case and filed a proof of claim in the Debtor's bankruptcy case, and Count IX herein is an Objection to that Proof of Claim.

## Parties

10.  The Debtor is a Delaware corporation.  Founded in 2004, the Debtor provided acceptance, processing, support, authorization and settlement services for credit card, debit card and e-check payments.

11.  On August 4, 2014, the Debtor filed a voluntary chapter 11 petition in this Court.  The Debtor remains a debtor in possession pursuant to Bankruptcy Code §§ 1107(a) and 1108.

12.  On September 23, 2014, the Court entered an order authorizing the sale of substantially all of the Debtor's assets (the "Sale") pursuant to an asset purchase agreement with

EPX Acquisition Company, LLC (the "Purchaser"). See Bankr. No. 14-11848 D.I. 249. On October 23, 2014, the Sale closed. Consequently, with limited exceptions not relevant here, the Debtor no longer has any assets with which to operate its business.

13. POST Integrations, Inc. ("POST Integrations" and together with Ebocom, "POST") is a corporation organized under the laws of Illinois, whose business address is 3131 East Camelback Road, Suite 320 Phoenix, Arizona 85016.

14. Ebocom is a limited liability company organized under the laws of Delaware, whose business address is also 3131 East Camelback Road, Suite 320 Phoenix, Arizona 85016.

15. POST claims to provide credit card transaction processing services to the hotel industry.

16. On October 24, 2014, POST filed Proof of Claim Number 64 with the Debtor's claims agent, Rust Omni (the "Proof of Claim"). The Proof of Claim was filed in the amount of $10 million and was based on POST's alleged ownership of source code that the Debtor sold to the Purchaser.

**Factual Background**

17. In the spring of 1999, POST was looking to bring in house credit card processing services that it provided to its customers. POST had previously relied upon third parties to provide some of those processing services.

18. Thus, at that time, Mary Gerdts, president of POST, contacted a software developer named Len Campagna who had a small Phoenix software development company with his business partner Alec Dollarhide called Nelcela, Inc. ("Nelcela").

19. Campagna told Gerdts that he owned a software system for processing credit card transactions (the "Nelcela System").

20. The Nelcela System included a front-end (terminal driver) component, back-end processing capability, inquiry and settlement functions, and fraud control and monitoring capabilities.

21. In 2000, Nelcela and POST entered into a contract whereby Nelcela, in exchange for $750,000 plus an hourly customization fee, would furnish POST with source code that would have the following functionality: Front End (Terminal) Driver, including POS Terminal Driving Device, ATM Terminal Driving Device, Real Time Electronic Transaction Switch, Batch Capture Device, Batch Load to TD Database, Archive and Export, 3780 COM Driver, Load TD with Terminal Parameters, Load TD with DES Keys Info, Front End TD Reports; "Back End," including Amex/Discover/Diners File Creation Outbound and Exception Processing; "Inquiry and Settlement," including E-Mail Function for Activity, E-Mail Function for Statement, Active Web System for Merchant Tran Lookup, Active Web System for Merchant Statement, E-Mail Confirmation of Batch Processing, E-Mail Request for Copy and Chargeback Compliance, ISO Statement Generation, Settlement, and Billing Reports; "Fraud Control," including Match Inquire File Creation, Match and File Creation, Merchant Fraud Control Monitor, Merchant Fraud Reports, Merchant Suspect Reports, and Card Use Suspect Reports.

22. Under the agreement between Nelcela and POST, Nelcela agreed to create additional functionality that was not provided by the then-existing Nelcela System (that additional functionality combined with the then existing Nelcela System being called the "Customized Nelcela System" by the district court in the Arizona Litigation (as defined below)). This is apparently the code that POST calls the "POST Custom Code."

23. On September 20, 2000, POST paid Nelcela $200,000 as its down payment on the Nelcela System in accordance with the parties' agreed-upon payment terms.

24. From October to December 2000, POST paid Nelcela $362,000 for development of the first part of the custom code that Nelcela was obligated to write for POST for incorporation into the Customized Nelcela System.

25. On December 28, 2000, POST went "live" on the Customized Nelcela System that had been modified by Nelcela. The Customized Nelcela System was operated by Nelcela at its site, and not delivered to POST.

26. In attempting to use the Customized Nelcela System to process credit card transactions and to conduct associated billing and reporting activities on the Customized Nelcela System, POST asserts that it discovered that the following basic functionality did not in fact exist in the system: (1) the ability to perform noncompliance and downgraded transactions; (2) the ability to send Diners and JCB transactions through the VITAL gateway; (3) the ability to match deposits and generate an exception report; (4) the ability to perform various chargeback functions such as searching for a cardholder number and finding authorization for the transaction; (5) perform international processing; and (6) daily billing.

27. POST also determined that certain credit card processing functionality, that Nelcela represented had been provided and for which POST had paid, was not present as of the "go live" date of December 28, 2000: (1) configuring to delay ACH payments and (2) a fraud control application.

28. POST also determined that certain credit card processing functionality was critically deficient and inoperable in the Customized Nelcela System, including the fact that neither the April 2000 nor October 2000 VISA/MasterCard interchange business enhancements were made in the system.

29. In addition, the Customized Nelcela System could not electronically pass chargebacks or accurately account for interchange.

30. Nelcela never delivered the Customized Nelcela System to POST, but rather operated it at Nelcela's site.

31. Beginning January 2, 2001, POST demanded that Nelcela correct the deficiencies in the Customized Nelcela System and deliver a properly functioning system to POST. But Nelcela refused and was unable to correct key deficiencies in the Customized Nelcela System.

32. POST paid a total of $562,000 for the Customized Nelcela System.

33. Thereafter, POST spent less than $500,000 on a replacement system for the deficient Customized Nelcela System, including purchasing replacement software from a company called Merchant Transaction Systems, Inc. ("MTSI").

34. In 2004, POST asserted claims against Nelcela in the United States District Court for the District of Arizona in litigation that had been pending since 2002 and that had been initiated by MTSI (the "Arizona Litigation"). The Arizona Litigation involved competing claims of ownership and copyright infringement asserted by Nelcela and its principals, MTSI, POST, and Lexcel, Inc. ("Lexcel") with respect to certain computer software for processing credit card transactions. Importantly, the Debtor was never a party to the Arizona Litigation.

35. In its claims against Nelcela in the Arizona Litigation, POST alleged that Nelcela never delivered fully functional software to POST. POST further alleged that the Customized Nelcela System was not merchantable and was not reasonably fit and suited for the purposes for which it was purchased. POST also alleged that Nelcela had misrepresented the functionality existing in the Nelcela System and in the Customized Nelcela System. POST prevailed on these claims in a jury trial held in 2009. In that trial, the jury awarded POST and against Nelcela

$3,145,797 on its breach of contract claim, fraud claim, consumer fraud claim, and negligent misrepresentation claim, and $550,000 on its breach of warranty claim. In obtaining these awards, POST argued to the jury that the Customized Nelcela System (which is what POST now calls the POST Custom Code and asserts is worth $10 million) was woefully deficient and did not function properly. The district court then set off a judgment in favor of Nelcela and against POST to order a final damages award in favor of POST of $2,998,228. POST did not appeal that damages award. POST has been executing on that judgment since 2010.

36. Meanwhile, on January 20, 2006, POST, MTSI, and Lexcel entered into a settlement agreement (the "Tri Party Agreement"). The Tri Party Agreement provides that Lexcel and not POST is owner of the "Lexcel Software," which definition includes the "Nelcela Software." The "Nelcela Software" is defined as including the Terminal Driver, Authorization System, and Merchant System—all of which formed parts of the Nelcela System. Thus, under the Tri Party Agreement, POST agreed that Lexcel and not POST owned the Terminal Driver, Authorization System, and Merchant System parts of the Nelcela System.

37. The Tri Party Agreement also provides in section 3.2 that, "[t]o the extent any portion of the POST Software is found to have been derived from the Lexcel Software, Lexcel hereby conveys and assigns all rights and title to such derivative work to Ebocom LLC." There has never been a finding by any court or jury that the "POST Software" was derived from the "Lexcel Software". Even if there had been such a finding, section 3.2 did not convey to Ebocom (or POST Integrations) ownership of the Lexcel Software or the Nelcela Software. To the contrary, that agreement specifically states that Lexcel continues to own the Lexcel Software.

9

38. In the Arizona Litigation, POST also had sought a declaratory judgment that it owned the Customized Nelcela System—which (again) is apparently what POST now calls the POST Custom Code.

39. The district court in the Arizona Litigation held on September 30, 2006 that, because POST only contributed partial payment for use of the Customized Nelcela System, POST could not be deemed to be the owner of it as a matter of law. POST did not appeal this ruling. POST therefore does not own what it calls the POST Custom Code. It bears noting that the alleged transfer to POST of the so-called POST Custom Code by Lexcel occurred before that ruling by the Arizona District Court, yet POST never argued to the Arizona District Court that its ownership rights stem from that agreement, thereby mooting the issue of ownership through payment to Nelcela.

40. In the Arizona Litigation, the first jury determined that Lexcel, and not POST, is the owner of the following parts of the Nelcela System (which is also known as the Nelcela Software under the Tri Party Agreement): the "authorization system," "merchant system," and "Database Architecture."

41. On February 10, 2006, counsel for POST wrote a letter to the Debtor. The letter asserted that the Debtor "may be using credit card processing software in which POST claims an ownership interest." The letter referred to POST seeking a declaratory judgment of ownership in software "that POST commissioned and paid Nelcela, Inc. for." The letter was referring to what POST now calls the "POST Custom Code." The letter suggested a meeting "to determine whether or not [the Debtor] is using any of the software in which POST claims an interest."

42. The Debtor did not respond to the February 10, 2006 letter from counsel for POST.

43. Despite the fact that the Debtor did not respond to the February 10, 2006 letter, POST never again asserted that it owned any part of the Debtor's software until this bankruptcy case, eight years later.

44. On May 24, 2007, counsel for Lexcel sent a letter to the Debtor. The letter claimed that Lexcel owned the Lexcel Software, and that the Lexcel Software included the "Nelcela Software." The letter asserted that the Debtor was using the Nelcela Software and that such use was unauthorized and copyright infringement.

45. After filing a lawsuit for a declaratory judgment in the District of Delaware, the Debtor entered into a settlement agreement with Lexcel on September 9, 2008 (the "Lexcel-Debtor Agreement"). Pursuant to the Lexcel-Debtor Agreement, the Debtor paid Lexcel a total of $400,000 (including a contribution of $75,000 from the Debtor's insurance carrier -- Seneca Insurance Company) for the right to use the Lexcel Software, which included the Nelcela Software. In the Lexcel-Debtor Agreement, Lexcel warranted and represented that it was the sole and exclusive owner of the Lexcel Software (which was defined as including the Nelcela Software) and that POST had no right, title, or interest in or to that software.

46. Before or shortly after the Lexcel-Debtor Agreement was executed, POST reviewed it.

47. After reviewing the Lexcel-Debtor Agreement, POST never communicated with the Debtor to assert that Lexcel's representation that Lexcel was the sole owner of the Lexcel Software (which included the Nelcela Software) was in any way incorrect.

48. What POST now calls the Post Custom Code has never been assigned to Lexcel, and Lexcel never acquired any rights in the Post Custom Code.

49. POST (as opposed to its counsel) has never seen what it calls the POST Custom Code.

50. POST never took possession of what it calls the POST Custom Code. Nor has it used it in its business, licensed it to others, or sued anyone for infringement of it.

51. POST has not registered with the Copyright Office what it calls the POST Custom Code.

## COUNT I

**(Declaratory Judgment - POST Never Owned What it Calls the "POST Custom Code")**

52. The Debtor incorporates the preceding paragraphs by reference as if re-alleged herein.

53. The Debtor seeks a declaratory judgment that POST never owned what POST calls the "POST Custom Code."

54. As explained above, POST never paid Nelcela the agreed purchase price for the Customized Nelcela System and, accordingly, the district court in the Arizona Litigation held in 2006 that POST does not own it. POST never appealed that decision, so it is binding on POST. Moreover, POST received a judgment against Nelcela that included an amount that represented the return of all the money POST had paid Nelcela for the Cusotmized Nelcela System.

55. POST also never received ownership of what it calls the POST Custom Code because it never was assigned ownership by any other party that owned it. In particular, POST never received an assignment from Nelcela.

56. Therefore, POST never owned what it calls the POST Custom Code.

## COUNT II

**(Declaratory Judgment – Lexcel Granted the Debtor a Perpetual, Royalty Free and Fully Transferrable License to Use the POST Custom Code)**

57. The Debtor incorporates the preceding paragraphs by reference as if re-alleged herein.

58. Lexcel granted the Debtor a license to use any product that is derivative of the "Lexcel Software" pursuant to the Lexcel-Debtor Agreement. This includes the POST Custom Code. That license is fully paid and is perpetual.

59. Therefore, prior to the Sale, the Debtor had a perpetual, royalty-free and fully transferrable license to use what POST calls the POST Custom Code.

## COUNT III

**(Declaratory Judgment - The Debtor Did Not Sell the POST Custom Code to the Purchaser)**

60. The Debtor incorporates the preceding paragraphs by reference as if re-alleged herein.

61. The Debtor seeks a declaratory judgment that the Debtor did not sell what POST calls the POST Custom Code to the Purchaser.

62. The Debtor did not have in its code base what POST calls the POST Custom Code. Accordingly, the Debtor did not sell or transfer it to the Purchaser.

## COUNT IV

**(Declaratory Judgment - POST Has No Ownership or Other Interest in Any of the Source Code That Was Sold to the Purchaser)**

63. The Debtor incorporates the preceding paragraphs by reference as if re-alleged herein.

64. The Debtor seeks a declaratory judgment that POST has no ownership or other interest in any of the source code that was sold to the Purchaser by the Debtor.

65. Since POST never owned what it calls the POST Custom Code, it could not have any interest in any code that was sold to the Purchaser.

66. In the alternative, even if POST did have any ownership interest in what it calls the POST Custom Code, the Debtor did not have or use that code, so it was not sold to the Purchaser.

67. Therefore, POST has no ownership or other interest in any of the source code that was sold to the Purchaser.

## COUNT V

**(Declaratory Judgment - POST Has No Right or Other Entitlement to Any of the Proceeds of the Sale)**

68. The Debtor incorporates the preceding paragraphs by reference as if re-alleged herein.

69. Because it never owned code that the Debtor used, POST has no right or other entitlement to any of the proceeds of the Sale.

70. Therefore, POST has no right or other entitlement to any of the proceeds of the Sale.

## COUNT VI

**(Declaratory Judgment - Invalidity of Copyright)**

71. The Debtor incorporates the preceding paragraphs by reference as if re-alleged herein.

72. In the event that it is determined that POST owns what it calls the POST Custom Code, some or all of that code is not copyrightable.

## COUNT VII

### (Declaratory Judgment - Statute of Limitations)

73. The Debtor incorporates the preceding paragraphs by reference as if re-alleged herein.

74. More than three years before filing the Proof of Claim, POST knew or should have known that the Debtor was asserting ownership over all of its code base—including any aspect of that code in which POST would now claim any interest.

75. More than three years before filing the Proof of Claim, POST knew or should have known that the Debtor's assertion of ownership in the Debtor's code base was completely inconsistent with any assertion by POST that it owned any part or aspect of that code base.

76. Accordingly, even if POST ever could have asserted a claim for ownership of any of the Debtor's code, that claim is now barred by the applicable statute of limitations, 17 U.S.C. § 507(b).

## COUNT VIII

### (Attorney's Fees)

77. The Debtor incorporates the preceding paragraphs by reference as if re-alleged herein.

78. Based on the factors enumerated in *Fogerty v. Fantasy, Inc.*, 510 U.S. 517 (1994), the Debtor is entitled to all of its reasonable attorneys' fees and nontaxable costs under the Copyright Act, 17 U.S.C. § 505, including, but not limited to, fees and nontaxable costs in connection with POST's Response to Debtor's Motion to Approve the Sale (D.I. 210), POST's Rule 2004 Request (D.I. 284), and the Proof of Claim. Among other things, POST's assertion of ownership was frivolous; its assertion that the Debtor was using and sold the POST Custom

Code was frivolous; the amount asserted in the Proof of Claim was knowingly false, had no basis whatsoever in fact, and was designed to pressure the Debtor into a settlement; and POST's assertion of ownership is time barred.

### COUNT IX

**(Objection to the Proof of Claim)**

79.  The Debtor incorporates the preceding paragraphs by reference as if re-alleged herein.

80.  Pursuant to section 502(a) of the Bankruptcy Code, a proof of claim is deemed allowed unless a party in interest objects thereto.

81.  The Debtor objects to the Proof of Claim on all of the grounds set forth in Counts I - VII, and, in addition, the following grounds: POST's Proof of Claim is barred pursuant to the statute of limitations since POST knew or should have known more than 3 years before it filed a proof of claim that the Debtor claimed ownership over its entire code base, and disagreed with POST's assertions of ownership as set forth in the February 10, 2006 letter from counsel for POST to the Debtor.

82.  Debtor further objects to the Proof of Claim because the $10,000,000 claimed value is frivolous on its face for at least the following reasons:[2]  (1) as POST itself alleged, the POST Custom Code had little or no value; indeed, its large jury award was based on that assertion; (2) even if the POST Custom Code had functioned as POST claims it should have, POST itself was only willing to pay up to $750,000 plus an hourly customization fee for it and, in fact, only paid $562,000 for it; (3) POST only paid $500,000 in replacement costs to replace the POST Custom Code; (4) POST already received a judgment in an amount that was well in

---

[2] The Debtor intends to (1) file a motion pursuant to section 502(c) of the Bankruptcy Code to estimate the maximum amount of the Proof of Claim and (2) notice such motion for hearing at the December 18 hearing in the Debtor's chapter 11 case.  The issues set forth in paragraph 82 will be raised in that motion.

excess of the amount that it paid to Nelcela to create the POST Custom Code; and (5) the Debtor paid Lexcel $400,000 for a perpetual, royalty free and fully transferrable license to use the POST Custom Code.

83. Accordingly, pursuant to section 502(b) of the Bankruptcy Code, the Debtor requests that the Court disallow the Proof of Claim. The Debtor expressly reserves the right to further object to the Proof of Claim and any other filed or scheduled claim on any other basis.

WHEREFORE, the Debtor requests that the Court enter judgment against POST and in favor of the Debtor, and specifically:

A. declare that POST never owned the POST Custom Code;

B. declare that Lexcel granted the Debtor a perpetual, royalty free and fully transferrable license to use the POST Custom Code;

C. declare that the Debtor did not sell the POST Custom Code to the Purchaser;

D. declare that POST has no ownership or other interest in any of the source code that was sold to the Purchaser;

E. declare that, in the event that it is determined that POST owns what it calls the POST Custom Code, some or all of that code is not copyrightable;

F. declare that POST's claim for ownership of any of the Debtor's code is barred by the applicable statute of limitations;

G. declare that POST has no right or other entitlement to any of the proceeds of the Sale;

H. disallow the Proof of Claim; and

I. award the Debtor attorneys' fees, costs, and all other just and appropriate relief.

Date: November 11, 2014
    Wilmington, Delaware

Respectfully submitted,

/s/ *Zachary I. Shapiro*
Mark D. Collins (No. 2981)
Russell C. Silberglied (No. 3462)
Zachary I. Shapiro (No. 5103)
RICHARDS, LAYTON & FINGER, P.A.
920 N. King Street
Wilmington, Delaware 19801
Telephone:  302-651-7700
Facsimile:  302-651-7701
Email: collins@rlf.com
       silberglied@rlf.com
       shapiro@rlf.com

and

David J. Wolfsohn (admitted *pro hac vice*)
DUANE MORRIS LLP
30 South 17th Street
Philadelphia, PA  19103-4196
Telephone: 215-979-1866
Facsimile:  215-689-2739
Email:  djwolfsohn@duanemorris.com

*Counsel for the Debtor*